## SNEIDER v. FRANK J. GOETTNER CONSTRUCTION CO., INC.

[No. 404, September Term, 1968.]

*Decided October 9, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*William W. Cahill, Jr.,* with whom were *Weinberg & Green* on the brief, for appellant.

*Robert H. Bouse, Jr.,* with whom were *John F. King* and *Anderson, Coe & King* on the brief, for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

Appellant (Sneider) fell from a ladder and dashed his foot against the basement floor of the house appellee (Goettner) was building for him. The ensuing litigation ended in the direction of a verdict for Goettner. Aggrieved, Sneider appeals to us. Since we think Goettner

seems to have the right of it we shall not disturb the action of the trial judge.

In October 1963 Goettner agreed to build the house specified by Sneider's architect. Article 7 of their contract required Goettner to "permit and facilitate observation of the work by [Sneider] * * * at all times." Goettner said Sneider came "quite often;" that he could not "keep him off" of the job. Around mid-afternoon on 15 April 1964 Sneider and his brother-in-law, Robert Siegmeister, visited the still unfinished house. Sneider took Siegmeister on a "tour." Eventually they came to the opening for the stairwell leading to the basement. Siegmeister said the opening was four feet wide and "maybe six or seven feet long." One part of an aluminum extension ladder, at the time the only means of access to the basement, was resting against "the four foot part." It "stuck up out of the stairwell" two or three feet above the level of the floor. Sneider announced his intention to descend into the basement to inspect a "blower fan" which was being installed in connection with the air conditioning machinery. He had used the ladder several times before 15 April but he could not "recall whether * * * [on those occasions] the concrete had already been poured or whether it was still gravel." At any rate, the floor of the basement was concrete on this occasion. We shall let him describe what followed:

> "Well, I went to the stairwell and I remember looking down it at the new floor which I had, I don't believe I had seen before, and the usual ladder was in place and I—as I usually do when I go up and down a ladder and which wasn't usual for me—I make sure that the angle of the ladder is correct for safety and, feeling assured that it was safe to go down, I—and I remember this distinctly, putting my feet on the rung below the first-floor level. In other words, I took particular caution not to step on the rung that was above the header and I

stepped on the rung below the header and with one foot and then easily swung over and put both feet, had both feet on the rung with both hands on the ladder and then, as I started to descend taking my next step downward, I could feel the ladder slipping away and it just seems like I hung there an eternity and I remember just falling straight down and hitting, I guess, stiff-legged on the concrete and then just falling backwards on my buttock and rolling onto my back and then feeling this excruciating pain in my left heel and I knew immediately it must be broken, a burning sensation."

Siegmeister testified Sneider "adjusted the ladder and pulled it up to an upright, more upright, position." It then "sat flush and more upright" against the open part of the stairwell, he said. Siegmeister was not asked to hold the ladder nor did he. He described Sneider's fall as a "toppling backwards." "The ladder," he went on to elaborate, "was sliding away *this way* and he [Sneider] was going *this way* so he lost the ladder. The ladder was falling, * * * in a counterclockwise direction; he was falling in a slightly clockwise direction." (Emphasis added.) Since the ladder also fell into the basement Siegmeister had to wait until one of the workmen replaced it before he could descend and minister unto his kinsman.

Earl Spivey, to whom Goettner had subcontracted the duct work, had gone down the ladder "about eight or ten times" during the morning of the same day. "The last time" he swung around "and went down sort of sudden." "The ladder went out from under" him; he fell "and broke * * * [his] left ankle heel bone." He said the concrete floor "had been poured recently * * * a couple of days before." Goettner was on the job when Spivey fell. He said he was aware of the incident. He left, however, before Sneider arrived. Sneider, it seems, knew nothing of Spivey's fall. Goettner testified that when he left the

ladder had been replaced in the stairwell and was being used by Spivey's mechanics.

We think *Velte v. Nichols*, 211 Md. 353 (1956) is controlling. The salient facts in that case, as related by Judge Henderson (later Chief Judge) who delivered the opinion of the Court, are as follows:

"On December 21, 1954, the plaintiff drove his truck to the place of business of the defendants, commission merchants, at 9 East Camden Street in Baltimore. He testified that he entered the store and bought some yarding and then asked Wilson Nichols if he had Christmas trees for sale. Mr. Nichols said he did, and asked how many he wanted. He replied that he wanted fifty to a hundred bundles if they were good. There was a covered trailer parked at the curb in front of the store loaded with bundles of trees, more than half full. The rear was open and there was a six-foot ladder leaning against it. Mr. Nichols did not leave the store, but told him to 'go up and look at them and throw out what I wanted.' He did not notice whether or not the truck had a tailgate, but the top of the ladder was against the trunks of the trees. He walked up to the top of the ladder, with both feet on the top rung, and the foot of it slipped out, causing him to fall. He tried to hold on to the trees but they were slippery with ice and sap. He learned later that there was ice, covered with pine needles, under the foot of the ladder. He did not examine or test the ladder before he climbed it. He denied that there were any employees of the defendants on the scene at the time of the accident. There were usually employees around to help customers load trees, but he never asked them to help him select trees or throw them down. He had been buying trees for twenty years, from trucks or railroad cars,

and always preferred to make his own selection rather than to rely on samples." *Id.* at 354-55.

The Court was of the opinion that the facts, as recited above, "support the theory of assumption of the risk." Judge Henderson went on to say:

"* * * In the instant case the ladder was not defective. The inherent danger that the foot of the ladder may slip, when it is leaning against a tailgate or the trunks of trees, was as apparent to the plaintiff as it could have been to the defendants. Yet the plaintiff did not test the stability of the ladder but on his own statement mounted it to the very top, without inspection. As a matter of fact there was no evidence that the defendants knew that there was ice in the street under the ladder. That condition could have been ascertained upon inspection by the plaintiff as well as by the defendants." *Id.* at 356.

We cited *Velte* with approval in *Chalmers v. Willis,* 247 Md. 379 (1967), *Gibson v. Beaver,* 245 Md. 418 (1967), *Burke v. Williams,* 244 Md. 154 (1966), and *Evans v. Johns Hopkins University,* 224 Md. 234 (1961). To the same effect *see Lawrence v. Cavanaugh,* 249 Md. 176 (1968). *See also Sacks v. Pleasant,* 253 Md. 40 (1969).

Sneider insists that "the case at bar is plainly distinguishable from" *Velte.* Velte, he points out, made no attempt to test the stability of the ladder and mounted it without inspection, whereas Sneider adjusted the ladder "to make sure that it was safe." It seems to us, however, that the distinction, if indeed there is one, attenuates rather than sustains Sneider's argument. Spivey's mechanics had been using the ladder, safely it appears, for some time before Sneider arrived at the stairwell. It would not be unfair to assume that the ladder was resting against the edge of the stairwell at an angle from the

perpendicular which permitted one to ascend or descend in relative safety. Had Sneider descended without changing the angle one ought to suppose that he also would have made his inspection without injury. The testimony is none too clear as to what actually happened when he fell. The witnesses illuminated their recital of the incident with gesticulation which the record does not transmit—e.g., "the ladder was sliding away *this way* * * * he was going *this way*." (Emphasis added.) Nor can we grasp the respective connotations of "counterclockwise" and "slightly clockwise." We are invited to find some significance in the absence of "rubber stockings" or rubber pads at the foot of the ladder. We see none. That there were no such things was as observable to Sneider as it would have been to anyone, perhaps more so because he had made prior use of the ladder.

What we have said, of course, makes unnecessary any consideration of primary negligence on the part of Goettner and contributory negligence on the part of Sneider; it must not be supposed, however, that had we considered the one or the other we might have reached a different result.

*Judgment affirmed.*
*Appellant to pay the costs.*